**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **Ciara H.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 C 2741** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **ANDREW M. SAUL, Commissioner of** | ) | |
| **Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

Plaintiff Ciara H. filed this action seeking review of the final decision of the Defendant Commissioner of Social Security (the "Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. (Doc. 1). The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 7, 9). Plaintiff has now filed a Motion for Summary Judgment requesting that the Commissioner's decision be reversed and the case be remanded for further proceedings (Doc. 11), and the Commissioner has responded with a Motion for Summary judgment requesting that the decision be affirmed. (Doc. 16). After reviewing the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings consistent with this Order. The Court therefore grants Plaintiff's Motion for Summary Judgment and denies the Commissioner's Motion for Summary Judgment.

---

[1] Commissioner Saul is substituted for his predecessor, Nancy A. Berryhill, pursuant to Fed. R. Civ. P. 25(d).

## **BACKGROUND**

### I.    Procedural History

Plaintiff protectively filed her SSI application on April 30, 2013, alleging disability beginning at the time of her birth in early 1994, due to brain stem stroke, speech impediments, and motor difficulties.  (R. 68, 186, 189).[2]  Although she claimed disability dating back to her birth, SSI benefits are not payable until the month after the application filing date (20 C.F.R. 416.335), and so Plaintiff's application sought benefits beginning after April 30, 2013 (the application filing date) when she was 19 years old.  (R. 15, 69).

The application was denied initially on May 5, 2014 (R. 68-76), and on reconsideration on April 30, 2015.  (R. 77-88).  Plaintiff then requested a hearing (R. 101-02), which was later held before Administrative Law Judge ("ALJ") Edward P. Studzinski on February 22, 2017, where Plaintiff was represented by counsel.  (R. 33).  Both Plaintiff and Vocational Expert ("VE") Brian L. Harmon testified at the hearing.  (R. 34).  The ALJ denied Plaintiff's claims in a decision dated June 9, 2017 (R. 15-24), finding Plaintiff has an RFC to perform light work with multiple limitations as described to the VE (R. 18-19, 62-64) and thus could perform the jobs of cleaner/housekeeping and sorter, which existed in significant numbers in the national economy.  (R. 23-24).

Plaintiff sought review with the Appeals Council (R. 161), but that request was denied on February 13, 2018 (R. 1-6), rendering the ALJ's June 2017 decision final and reviewable by this Court.  *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).  Plaintiff now makes four arguments for reversal:  (1) the ALJ's assessment of Plaintiff's allegations of disabling symptoms was based on improper inferences, including an inference "that

---

[2]    Citations to the Certified Copy of the Administrative Record filed by the Commissioner (Doc. 9) are indicated herein as "R."

Plaintiff's part time work and single on line class translate into an ability to sustain full time work"; (2) the ALJ improperly assessed Plaintiff's medical opinions regarding her motor, linguistic, and cognitive impairments; (3) the ALJ's RFC determination failed to accommodate all of Plaintiff's limitations, particularly those in concentration, persistence, or pace; and (4) the ALJ erroneously accepted the VE's testimony regarding available jobs Plaintiff could perform, particularly in view of her difficulties with motor speed and using her hands. (Doc. 12, at 7-15). For the reasons explained below, the Court agrees with the first two arguments, agrees in part with the third, and rejects the fourth.

## II.      Plaintiff's Medical, Educational, and Work Background

### A.      Plaintiff's Birth and Early Development

Plaintiff was born in early 1994, six weeks premature and weighing four pounds, four ounces. (R. 259, 516, 522).[3] At the time of her birth, she had a normal APGAR score of 9 (indication of a baby's functioning after birth on a scale of 1 to 10, with a higher score indicating better functioning), but two hours later she was noted to be unable to suck and swallow while feeding, and was believed to have developed a brainstem infarct. (*Id.*). Plaintiff then spent about eight weeks in the Neonatal Intensive Care Unit ("NICU") at Lutheran General Hospital and required a nasogastric ("NG") feeding tube for the first fourteen months of her life. (R. 522). While in the NICU, Plaintiff was noted to demonstrate poor tone and impaired suck reflex and gastro-esophageal reflux. (R. 516).

During her early development, Plaintiff reportedly experienced delays in motor functioning and speech, and thus did not walk until twenty-two months old and did not speak until thirty-six months old. (*Id*). She had ongoing difficulties with balance and

---

[3]      Although the disability period for Plaintiff's application commences upon its filing date, the ALJ considered her full medical history (R. 15), and this Court does the same.

coordination, drooling and swallowing, impaired speech, fine motor weakness, and slowed learning secondary to reduced motor speed. (R. 516). She was diagnosed with developmental delay, hypotonia (decreased muscle tone), micrognathia (undersized lower jaw), maxillary hyperplasia (protruding upper jaw), and oral-motor apraxia (difficulty coordinating jaw, lips, and tongue to speak). (*Id.*). She also suffered recurrent ear infections as a baby, possibly causing some hearing loss in her right ear. (R. 387, 516).

Plaintiff also began having seizures at age two. (R. 516-17). EEGs taken in 1997, 1998, and 1999 (when Plaintiff was roughly three, four, and five years old) were "significantly abnormal" (R. 272), "very abnormal" (R. 266), and "so markedly abnormal that small changes in epileptogenic activity may no[t] be easily appreciated." (R. 267). Each of these tests indicated some type of seizure activity, possibly epileptogenic, primarily in the left temporal region, but also affecting other regions of the brain. (R. 266-67, 272). After two additional EEGs demonstrated no epileptic activity during these seizure periods, Plaintiff was diagnosed with non-epileptic seizure disorder in 2002 (when she was about eight years old). (R. 517). Plaintiff took several anti-seizure medications over the years, but stopped all such medications in 2002, and reportedly experienced no further seizures after the age of eleven. (R. 387, 517).

## B. Plaintiff's Education

Plaintiff was educated through elementary school and high school, partly in local school district classes with support from individualized education programs ("IEPs") and partly through home schooling. (R. 190).[4] She also attended special education classes

---

[4] The record contains conflicting information regarding the years Plaintiff was educated inside and outside the home, with some records indicating that she was home-schooled through elementary school and others indicating that she was home-schooled for all or some of high-school. *See, e.g.*, R. 249 ("Home schooled through elementary school"), 357 ("home schooled

from 1996 to 2012 (ages two to eighteen), and received physical, occupational, and speech therapy for many years, both inside and outside the home, sometimes up to three times a week.  (R. 190, 386, 517, 522).  Plaintiff completed her high school education in May 2013, when she was nineteen years old.  (R. 190).

Following high school, Plaintiff began attending courses at a community college in 2013.  (R. 384, 517).  She started with four classes and was allowed several accommodations, including a note taker and alternative text formats for instruction, and a scribe (due to her slow writing speed) and extended time for test taking.  (R. 54, 384, 517).   With this level of support, Plaintiff was able to obtain a grade of "A" in most of her classes.  (R. 517).  But she later suffered a bout of depression and became stressed by a difficulty with one of her professors, and then stopped attending classes at some point during the Fall 2014 semester.  (R. 56, 506, 508, 517).  Plaintiff returned in 2015 and again earned an A in one of her classes (R. 533), but then switched to online courses which she can complete on her own schedule to avoid the stress of attending campus.  (R. 57, 523, 528, 533).  By January 2017, Plaintiff reduced her course load to just one online financial accounting course with the same accommodations.  (R. 54, 57, 525).

### C.    Plaintiff's Work Background and Living Situation

Plaintiff began a part-time job working for an office supply company in May 2014 at age 20, and still held that position as of the February 2017 administrative hearing.  (R. 38-39, 518).  Plaintiff's counsel explained in the proceedings below that she obtained the position through a family friend from church, and without applying, providing a resume,

---

until 6th grade"), 386, ("The last high school years were home schooled."), 388 ("home schooled for high school"), 517 ("homeschooled from sixth grade through high school"), 522 ("home schooled from sixth grade through high school by her mother" and "had the support of an IEP throughout her elementary and high school years (modifications and individualized assistance").

or interviewing. (*Id.*). According to her testimony, Plaintiff works three days a week from 1:00 to 5:00 p.m., and she works much slower than her peers, has no productivity requirements, and is allowed to miss work when she has a health issue or is suffering depressive symptoms. (R. 45-49, 61). Her job consists of crosschecking orders completed by others online to confirm the quantities and availability of the items ordered on the vendor's website. (*Id.*). Although this was determined to fall short of substantial gainful activity ("SGA"), Plaintiff earned $5,310 from May through December 2014, and $10,608 throughout 2015 (she continued working in 2016 and 2017 (R. 38-39), but totals for these years are not included in the record). (R. 17, 44, 181).

Plaintiff lives with her parents and younger brother, and has an older brother who no longer lives in the family home. (R. 517). As Plaintiff does not drive, she takes a pre-arranged bus to work with her mother's help in making the arrangements, and a family member picks her up from work, since the bus does not operate after 4:00 p.m. (R. 53, 386, 517). Plaintiff reportedly has good relationships with her parents and two brothers, rides a three-wheeled bike (she is unable to ride a two-wheeler), swings on a swing set for extended periods (twenty to forty minutes) after work, uses a computer, and plays cards and games, such as monopoly. (R. 55, 60, 386-88, 517, 520, 522). She can also perform some weekly household chores (vacuuming, dusting, emptying the dishwasher), but only limited cooking tasks (such as microwaving) and pet care with assistance, due to her fine motor impairments. (R. 57-59, 202, 228, 366).

### D. Medical Opinions Following Plaintiff's Application

#### 1. Medical Consultative Examination with Dr. Kalyani Perumal

About a year after her application was filed, Plaintiff underwent a medical consultative examination with Dr. Kalyani Perumal on April 12, 2014, accompanied by her

mother.  (R. 357-63).  After recounting Plaintiff's premature birth, reported motor skill impairment, and physical, occupational, and speech therapy, Dr. Perumal noted that Plaintiff could walk greater than 50 feet without support and had normal range of motion and strength in all extremities.  (R. 359-63).  He also noted that Plaintiff's grip strength was normal in both hands, and she was able to extend her hands fully, make fists, and oppose fingers to thumb.  (R. 359).

During a mental status examination, Dr. Perumal observed that Plaintiff was alert and oriented to person, time, and place; her behavior and ability to relate during the examination were normal; and she was appropriate, polite, pleasant, and cooperative.  (R. 363).  He opined that Plaintiff's affect was normal, she had no signs of depression, agitation, irritability, or anxiety; and her overall effort and cooperation were satisfactory.  (*Id.*).  And while her speech was impaired and she had difficulty getting words out, Dr. Perumal concluded that her comprehension was "entirely normal" and she was able to understand the questions asked and answer appropriately. (*Id.*). Dr. Perumal diagnosed Plaintiff with a brain stem stroke with speech and motor impairments since birth.  (*Id.*).

### 2. Psychological Consultative Examination with Dr. Glen Wurglitz

Plaintiff next underwent a psychological consultative examination with Dr. Glen Wurglitz on April 25, 2014, again accompanied by her mother.  (R. 365-68).  Dr. Wurglitz similarly noted that Plaintiff had no problems with ambulation, balance, or posture, and did not use an assistive device, and that her mood was pleasant and stable, her affect was appropriate and consistent with the content of the conversation, and she was oriented to person, time, place, and purpose of the visit.  (R. 366-67).  Dr. Wurglitz also observed that Plaintiff's speech quality was slow and sometimes difficult to understand, her pronunciation was over-articulated, and she showed difficulties finding words.  (*Id.*).

Dr. Wurglitz further opined that Plaintiff's short-term memory was good, and her fund of general information and awareness of current events were both fair, but her immediate memory was below average and she was repeatedly unable to remember his name.  (R. 367).  Her vocabulary indicated an understanding of simple and more complex words, and her abstract reasoning was found to be good, but she held her pencil with a whole hand grasp and had difficulty drawing more complex and abstract shapes (such as a stop sign) and was unable to draw the face of a clock with the correct time.  (R. 368).  Dr. Wurglitz diagnosed Plaintiff with a Depressive Disorder, Expressive Language Disorder, cerebral infarction, conductive hearing loss, and occupational and economic problems.  (*Id*).  He further opined that Plaintiff "may benefit from referral to Vocational Rehabilitation for additional career assessment, assistance in developing vocational skills, and support with job placement."  (*Id.*).

### 3. Pediatric Neurology Evaluation by Dr. Peter Heydemann

Again accompanied by her mother, Plaintiff next visited her own pediatric neurologist, Dr. Peter Heydemann of Rush Children's Hospital "for neurologic re-evaluation after many years to find out if she is disabled."  (R. 386, 388, 516).  In a report dated August 19, 2014, Dr. Heydemann opined that Plaintiff "has multiple handicaps as well as strengths," and listed the following:  lack of coordination, both fine and gross motor (evidenced by holding a pen with her fist and being able to hop only once on each foot and unable to ride a two-wheel bicycle); speech and language disorder, with prosody and pronunciation difficulties (evidenced by slow prosody and abnormal breath pattern between words and speech that is hard to understand); possible hearing loss due to repeated ear infections early in life; a learning disorder, but some abilities in math (particularly trigonometry); developmental delay; and inadequate social skills with peers.

(R. 387-88).  Regarding her learning abilities, Dr. Heydemann added that Plaintiff "learns slowly, but is capable when the work load is light."  (R. 388).  He also noted that Plaintiff has good arm strength proximally and distally, and a normal gait with heel strike, but her balance is marginal in that she gets off balance easily when standing in Romberg position. (R. 387).  Finally, Dr. Heydemann also noted that Plaintiff exhibits some repetitive movements, such as swinging on a swing for long periods of time, which "could make her fall within the autistic spectrum, but this is not an obvious diagnosis."  ().

Based on the foregoing, Dr. Heydemann concluded that Plaintiff "would have difficulty functioning as an independent adult but she need[ed] to be properly assessed." (R. 387).  He therefore recommended that Plaintiff see a neuropsychologist for additional testing, including an occupational therapy evaluation to assess visuomotor and fine motor skills, and neuropsychological testing to assess her IQ, learning skills, adaptive functioning, and possible autistic spectrum.  (R. 388).

### 4.    Neuropsychological Evaluation by Dr. Susan Walsh

On Dr. Heydemann's referral, Plaintiff and her mother next visited Dr. Susan Walsh, a psychologist at Loyola University Hospital, for a neuropsychological evaluation "to determine appropriateness for social security disability."  (R. 516).  After recounting Plaintiff's medical and developmental history, Dr. Walsh summarized the academic testing that Plaintiff had undergone since childhood.  Plaintiff's intellectual development at ages 7 and 9 fell within the low average range, although her academic skills were within the average range.  (R. 517-18).  Her most recent Cognitive Abilities Test administered in April 2013 when Plaintiff was 19 years old indicated that Plaintiff has average quantitative skills, slightly below average verbal skills, and borderline nonverbal skills, with an overall low average composite score.  (R. 418).  Dr. Walsh also noted the results

of an Adaptive Behavior Rating Scales test and a Childhood Autism Spectrum Test administered by Plaintiff's Mother. The former indicated low scores in communication and daily living and moderately low scores in socialization and motor skills, and the latter indicated probable Autism Spectrum Disorder. (R. 522).

Dr. Walsh also reported her own observations of Plaintiff's behavior. She noted that Plaintiff's gait and mobility appeared normal, and her hearing appeared normal and was functional for testing purposes. (R. 518-19). Plaintiff displayed an intermittent tremor in her jaw, and her speech was severely dysarthric but generally intelligible. (*Id*). Her comprehension was intact; she understood instructions well and did not need clarification; her thought processes were logical and relevant; and her cognitive tempo was steady. (*Id.*). Plaintiff was quiet but friendly; her mood was euthymic and her affect broad in range; she displayed good eye contact throughout the evaluation; and her health questionnaire responses indicated no depressive symptomology. (R. 518, 521).

Based on testing she conducted during the evaluation, Dr. Walsh further reported that Plaintiff's grip strength was "extremely low" in both hands, and she displayed "significant motor slowness" and an awkward pencil grip by holding the pencil in her left fist. (R. 519). She also noted that Plaintiff learned to write left-handed at her school's insistence, but may be right-hand dominant based on other activities. (*Id.*). Testing of Plaintiff's intellectual abilities revealed that her Full Scale IQ fell within the borderline range, with the four indexes factoring into that assessment in the low average (verbal comprehension and working memory), borderline (perceptual reasoning), and severely impaired (processing speed) ranges. (R. 519, 522). Other testing revealed that some of Plaintiff's cognitive abilities (visuospatial problem solving and immediate and delayed memory) were in the low average to average ranges, but her language functioning was

impaired, her verbal attention abilities were low average, her visual attention abilities were extremely low, and her overall attention score was also impaired. (R. 519-20). A predominant issue in Plaintiff's performance in these tests was how slowly she worked on the assigned tasks due to her "fine motor delay" and "significant lack of motor control," as evidenced by holding her pencil in a "fist-like manner," "resulting in very slow printing speed" and inconsistent legibility. (R. 518-19: "The patient worked slowly on these timed tasks in part due to fine motor delay"; R. 522: "The predominant issue that limited [Plaintiff's] test performance involved significant lack of motor control."). But there was also evidence of limitations even when motor components were eliminated. (R. 522).

Based on the foregoing, Dr. Walsh diagnosed Plaintiff with a Borderline Intellectual Disability, an Autistic Disorder, School Difficulties, and a Seizure Disorder. (R. 522). She further opined that Plaintiff "would be significantly limited in obtaining full-time, competitive employment for several reasons that include physical, cognitive and social limitations." (R. 523). Dr. Walsh explained as follows:

> She presents with significant dysarthric speech . . . that limits her ability to communicate effectively. As a result, [Plaintiff] would be unsuited for jobs that involve customer service. Though her academic development falls within the low average to average range her severely impaired fine and gross motor speed significantly limit her ability to write and/or type and particularly even more so when under time constraints. Given [her] motor limitations, she would not be able to do certain jobs, such as assembly-line work. Finally, her intellectual attainment falls with the Borderline range (IQ range 71-84) and she demonstrates a constellation of symptoms reflective of autism spectrum disorder. Such individuals require close supervision and/or an extended training period, have impaired judgment (socially naïve) and reasoning ability. They may have a limited ability to make judgments on complex work-related decisions and their interpersonal style limits their ability to work effectively with others.

(R. 523).

### 5. Treating Physician Opinion by Dr. Melissa Kwak

Finally, Plaintiff submitted a letter from her primary care physician, Dr. Melissa Kwak, dated October 19, 2016.  (R. 524).  Dr. Kwak offered her opinions in support of Plaintiff's request for SSI benefits and based them on her observations treating Plaintiff since November of 2013, a family report, a review of Plaintiff's records, and Dr. Walsh's July 2015 Neuropsychological Evaluation.  (*Id.*).

Like Dr. Walsh, Dr. Kwak opined that Plaintiff has an expressive, dysarthric speech disorder that impairs her ability to communicate; impaired fine and gross motor skills that limit her ability to write, type, and perform similar activities; and cognitive limitations, including a borderline range IQ and symptoms of autism spectrum disorder with impaired judgment and reasoning.  (*Id.*).  Also like Dr. Walsh, Dr. Kwak concluded that these factors "limit [Plaintiff's] ability to perform independently in the work force, make complex decisions, or work effectively with others," and that certain jobs, such as assembly line work and "jobs with similarly required motor skills," "would not be feasible" for her.  (*Id.*).

## III.  Proceedings Before the ALJ

### A.  The Administrative Hearing

Plaintiff appeared with counsel at a hearing before ALJ Studzinski on February 22, 2017.  (R. 33).  She explained that she does some household chores when her mother asks her to, but she cannot use a stove or oven for fear of dropping a hot pot, and has trouble doing laundry because it is difficult to hang clothes on hangers, both due to her fine motor impairments.  (R. 56-57).  Plaintiff also testified about her part-time job, explaining that she works four hours a day three days a week checking the hard copies of orders that are given to her against information on a vendor's website.  (R. 48-49).  She does this by typing in the correct order number on the vendor's website, confirming that

the correct items are listed on the order copy and are available on the vendor's website, and then indicating those things with a checkmark. (*Id.*). Plaintiff also explained that she feels no pressure to go faster but believes she is much slower than others who do the same work, based on an experience sharing a desk with a coworker who got through many more orders than she did in the same amount of time. (*Id.*). Plaintiff stated that she works the same schedule each week so she can take the same prearranged bus to work by calling a week in advance to schedule the time, and she can only work three days a week because that is all she can handle with her one online class at the community college. (R. 53, 56). Because the course is online, she can work on it on her own schedule and pace; and while she hopes to earn a degree from the school one day, "it's going to take awhile because [she] can only handle one class at a time." (R. 56-57).

After hearing from Plaintiff about her part-time job, the ALJ questioned VE Harmon about the classification of that work. The VE explained that the work Plaintiff described most closely resembled a general clerk, performed at a semi-skilled, sedentary level, but the job differed somewhat from the typical position in which the same clerk both processes the orders and checks them for quality. (R. 51-52). In Plaintiff's case by contrast, the VE explained, she is only quality checking orders that someone else places, which "may be an accommodated job." (R. 52). The ALJ then questioned the VE about a hypothetical individual who could perform light work (lift up to 20 pounds occasionally and 10 pounds frequently) with the following limitations, in relevant part: (1) gross manipulation frequently, but no forceful grasping or torqueing; (2) fine manipulation occasionally up to a third of the workday; (3) no complex or frequent written or verbal communication and no telephone communication; (4) simple, routine tasks that involve only simple decision making, no more than simple judgment, no significant self-direction, and no multitasking;

(5) only occasional and minor changes in the work setting; and (6) an average production rate, and no significantly above average or highly variable production pace work. (R. 63-64). The VE identified two jobs that such a person could perform, provided she was on task at least 85% of the workday and absent no more than one day per month, and both jobs require only occasional fingering: (1) cleaner/housekeeper and (2) sorter. (R. 64).

### B. The ALJ's Decision

The ALJ denied Plaintiff's claims in his June 9, 2017 decision. (R. 15-24). Although he found that Plaintiff suffers from the severe impairments of autism spectrum disorder, depression, anxiety, and speech/motor difficulties, the ALJ also found that Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (R. 17-18). He also found that Plaintiff has an RFC to perform light work as described to the VE with one change; while the VE was asked about jobs requiring only occasional fine manipulation (R. 62-63), the RFC in the ALJ's decision requires both fine and gross manipulation frequently. (R. 18-19). Based on this RFC and the VE's testimony that such a person could perform the jobs of cleaner/housekeeping and sorter even with only occasional fingering (R. 63-64), the ALJ found that Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy, and therefore is not disabled. (R. 24).

### DISCUSSION

## I. Governing Standards

### A. Five-Step Inquiry

To recover SSI benefits, a claimant must establish that she is disabled within the meaning of the Social Security Act. *Karafesieva v. Colvin*, No. 15 C 1186, 2016 WL 4137203, at *6 (N.D. Ill. Aug. 4, 2016). A person is disabled if she is unable to perform

"any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The following five-step inquiry is required to determine whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of the impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920.

B.    **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g). But in so doing, the Court may not engage in its own analysis of whether the claimant is severely impaired. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may the Court "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). A court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making this determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "provide a complete written evaluation of every piece of testimony and evidence." *Pepper*, 712 F.3d at 362 (quoting

*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).  Still, where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## II.    Analysis

### A.    The ALJ's Subjective Symptom Assessment

Plaintiff first challenges the ALJ's reliance on her part-time job and online community college class as evidence of her capacity for full-time employment.  (Doc. 12, at 8).  She argues that the ALJ improperly disregarded the limited hours she works (twelve a week), how she got the job (through a family friend from church, and without providing a resume or attending an interview), and the accommodations she receives there (no productivity requirements, a pace slower than her co-workers, and absences without consequence).  (*Id.* at 9-10).  Plaintiff further complains that the ALJ also wrongly discounted the academic accommodations allowed by her community college (a note-taker, alternative text formats, and a scribe and extended time for testing).  (*Id.*; R. 54, 384, 517).  Although the ALJ noted Plaintiff's testimony that her employer allowed her reduced productivity pressures, he dismissed that accommodation in the absence of any "indication in the record that the claimant is not performing services sufficient to merit her pay" and "no report from the claimant's employer that her work is unsatisfactory, or that she missed excessive work."  (R. 22).  And while the ALJ again acknowledged that Plaintiff received individualized services accommodations and academic adjustments, he nevertheless found "the fact [she] is performing well in college and performing semiskilled work, supports an ability to perform less demanding work at SGA levels."  (R. 22).  The Court agrees with Plaintiff that the ALJ's reliance on these factors was flawed.

### 1. Plaintiff's Part-Time Job

Although a claimant's part-time work may be considered when assessing her limitations, both the Court of Appeals and district courts within this Circuit have repeatedly cautioned that part-time work falls short of demonstrating an ability to work full-time when "the claimant works extremely limited hours and is given significant accommodations in the work place." *Wichelman v. Berryhill*, No. 18-cv-557, 2019 WL 2353462, at *2 (W.D. Wisc. June 4, 2019) (citing *Vanprooyen v. Berryhill*, 864 F.3d 565, 571 (7th Cir. 2017)); *Lanigan v. Berryhill*, 865 F.3d 558, 565-66 (7th Cir. 2017) ("We have cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment," especially when "the claimant's employer is accommodating him").[5]  Accordingly, "[w]hen evaluating a claimant's work experience as evidence of [her] RFC, an ALJ must consider whether the work was done under special circumstances or accommodations, including permission to 'take frequent rest periods' or 'work at a lower standard of productivity than other employees.'" *Warren*, 2015 WL 5081586, at *12 (quoting 20 C.F.R. § 416.973(c)).  The ALJ failed to apply these principles here.

---

[5]  *See also Vanprooyen*, 864 F.3d at 571 (part-time work was "not good evidence of ability to engage in full-time employment" where claimant "was able to continue working part-time only because some managers gave her easier shifts and other preferential treatment" and she "received help from coworkers, took unscheduled breaks, and wrote everything down without abbreviation"); *Voigt v. Colvin*, 781 F.3d 871, 876-77 (7th Cir. 2015) ("We've noted cases in which although the claimant is not only working but also 'earning a decent wage, he really is permanently disabled from engaging in gainful activity. . . . Maybe a seriously disabled worker is able to work only by dint of his extraordinary determination and the extraordinary assistance extended to him by kindly fellow workers.'" (quoting *Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994)); *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("the ALJ's assertion that Larson has succeeded in holding down a series of part-time jobs stretches the evidence beyond the breaking point.  There is a significant difference between being able to work a few hours a week and having the capacity to work full time."); *Warren v. Colvin*, 14 C 1622, 2015 WL 5081586, at *12 (N.D. Ill. Aug. 27, 2015) ("The Seventh Circuit has repeatedly stated that a person who is working may actually be disabled if the work is accommodated by a charitable or indulgent employer.") (citing cases).

The Commissioner defends the ALJ's consideration of Plaintiff's part-time work, citing SSR 96-8p, which provides for a non-disability finding when a claimant is able to perform past relevant work that was part-time but met the definition of substantial gainful activity. (Doc. 17, at 4, citing SSR 96-8p, 1996 WL 374184, n.2). Although the Commissioner concedes this Ruling is not applicable here because Plaintiff's part-time work did not meet the SGA requirement, he argues that it nevertheless demonstrates that "part-time work is not irrelevant to an ALJ's consideration." (*Id.*). True, but this argument fails to address the issue that Plaintiff has raised: the ALJ acknowledged Plaintiff's testimony that her employer allowed her reduced productivity pressures, but incorrectly discounted that accommodation because her employer had not complained that her work was unsatisfactory. (R. 22). As the Seventh Circuit explained in *Voigt*, a claimant's ability to secure employment and even earn a decent wage does not by itself demonstrate an ability to work full-time, since a charitable employer may be "retaining him on the payroll even though he is incapable of working," and that "act of charity ought not be punished by denying the employee benefits and thus placing pressure on the employer to retain an unproductive employee indefinitely." 781 F.3d at 876-77.

The ALJ also failed to address additional facts that make this possibility even more likely here, including Plaintiff's claim that she was given the job by a family friend from church and without providing a resume or interview, works only four hours a day three days a week, and is allowed to miss work without consequence. (R. 38-39, 45, 53, 386, 517-18). *See also Vanprooyen*, 864 F.3d at 571 (discussing "accommodations that the administrative law judge mentioned only in passing and sometimes failed to mention at all"); *Larson*, 615 F.3d at 752 ("Larson was able to work for Calliss part-time only because he was a friend who tolerated frequent breaks and absences that an ordinary employer

18

would have found unacceptable.").[6]   The VE also indicated that the work Plaintiff described "may be an accommodated job."  (R. 52).  *See also Stoy v. Comm'r of Soc. Sec.*, No. 17-cv-106, 2018 WL 3373505, at *4 (N.D. Ind. July 7, 2018) (VE testimony confirmed that claimant's part-time job "would be an accommodated employment rather than competitive employment," since "she was allowed to take breaks at will").  The ALJ's assertions that Plaintiff "is able to take public transportation" and "takes public transportation to her job" (R. 18-19) similarly overlooked the facts that she rides a prearranged bus to work by placing a reservation the week before with the help of her mother, and uses no public transportation to get home, thus requiring a family member to pick her up from work each day.  (R. 53-54, 386, 517).

### 2.   Plaintiff's Online Class

The ALJ's reliance on Plaintiff's online community college class to support a finding that she is capable of full-time work is similarly flawed.  Although he noted the academic accommodations and adjustments that Plaintiff receives from the school, the ALJ found them insufficient to establish "that she is incapable of unskilled work involving limited manipulation" in view of the facts that she "was reportedly good at math, could perform trigonometry, and that her spelling was good."  (R. 20).  But the ALJ's basis for these academic strengths was the August 2014 opinion of Plaintiff's pediatric neurologist, Dr. Heydemann, which also included the caveat (unmentioned by the ALJ) that Plaintiff "learns slowly but is capable when the workload is light."  (R. 20, 388).

---

[6]    The Commissioner's suggestion that Plaintiff's work accommodations were evidenced only by her testimony (Doc. 17, at 4-5 and n.2) is immaterial, since uncontroverted testimony alone would warrant considering the issue.  *See, e.g., Lanigan*, 865 F.3d at 565 (relying on claimant's testimony that his supervisor "was aware of his mental illness and 'tolerant of it'").  Moreover, the ALJ did not question Plaintiff's account of these accommodations, only whether her employer nevertheless regarded her work as worth her salary.  (R. 22, 47-48).

Equally problematic, having thus discounted Plaintiff's academic accommodations without fully considering her need for them, the ALJ went on to conclude not merely that they were insufficient to rule out capability of full-time work, but that the combination of Plaintiff's online class and part-time job affirmatively "supports an ability to perform less demanding work at SGA levels." (R. 22). And in so doing, the ALJ repeatedly referred to her "college classes" (plural), overlooking that she reduced her course load to just one class (after dropping out of school altogether due to depression) and then further reduced it to just one online class that she can attend if and when she is able. (R. 54, 56-57, 506, 508, 517, 525-26, 528, 533; *see also* R. 18 (referring to "college classes"), 20 (referring to "college courses including financial accounting classes"), 20 (referring to "college-level classes"), R. 22 ("performing well in college")). The ALJ also failed to explain how a single online community college course lightened with various academic accommodations, even when combined with working three half days a week (with no productivity requirements), "supports an ability to perform less demanding work at SGA levels" (R. 22), or how work at SGA levels could be less demanding. *See Meyer v. Comm'r of Soc. Sec.*, No. 15-cv-13, 2015 WL 7761633, at *8 (N.D. Ind. Dec. 2, 2015) (ALJ erred in relying on claimant's part-time jobs "on his own schedule" and "flexed around his bad days" where "there was no suggestion that such work was generally performed in the national economy with any type of flexible schedule" or "that the alternative representative jobs cited at step five could be performed on a flexible schedule").

To be clear, none of this is to say that the ALJ was prohibited from considering Plaintiff's part-time job or online class (even with the various accommodations she receives) when evaluating the severity of her alleged symptoms. For instance, it would be proper to identify any tasks performed during such activities that discredit related

claimed limitations.[7]  The errors here, by contrast, were the ALJ's reliance on these activities without considering how limited they are (working twelve hours a week and taking one online class), particularly in view of the accommodations Plaintiff receives for them (relief from productivity requirements, academic assistance, and a flexible class schedule) to conclude that Plaintiff is capable of full-time work.  (R. 22).  *See also supra* note 5.  Accordingly, the case is remanded for further consideration of Plaintiff's part-time job and class work to determine their impact on her claimed limitations and RFC in light of the above evidence.  While the ALJ might again conclude on remand that Plaintiff is not disabled even after considering the foregoing, it is necessary for him to build an accurate and logical bridge from that evidence to his conclusion.

## B.  The ALJ's Assessment of Plaintiff's Medical Opinions

The ALJ's assessment of Plaintiff's medical opinions (by Drs. Walsh and Kwak) was similarly flawed.  As the Commissioner acknowledges, the treating physician rule in effect at the time of Plaintiff's application (those filed before March 27, 2017) affords an opinion from a treating source controlling effect if well supported by medically acceptable findings and not inconsistent with other substantial evidence in the record.  (Doc. 17, at

---

[7]      *See*, *e.g.*, *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (proper to consider "critical" tasks that claimant performed independently for his mother's flower shop to discredit testimony "suggesting he was not capable of doing *anything* in a workplace"); *Lott v. Colvin*, 541 Fed. App'x 702, 705-07 (7th Cir. 2013) (proper to consider claimant's use of her hands while working part-time as a companion, by painting her client's nails and organizing her things, to discredit testimony that claimant had severe difficulty using her hands); *Streater v. Berryhill*, No. 16 CV 10943, 2017 WL 6625965, at *4 (N.D. Ill. Dec. 28, 2017) ("Although evidence of part-time work may not be 'good evidence of ability to engage in full-time employment,' *Vanprooyen*, 864 F.3d at 571, it was nonetheless reasonable for the ALJ to consider Streater's work history in evaluating the severity of his alleged symptoms" (citing *Lott*)); *Reed ex rel. Davis v. Berryhill*, No. 16 CV 11133, 2017 WL 3453384, at *7 (N.D. Ill. Aug. 11, 2017) (same); *Maxwell v. Berryhill*, No. 16 C 6101, 2017 WL 4180340, at *7 (N.D. Ill. Sept. 21, 2017) (proper to consider "that the standing, walking, and social requirements of Claimant's job 'were inconsistent with her allegedly disabling physical and mental limitations.").

10-11 and n.5).  *See also Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018).  Such

an opinion thus "trumps the conclusions of agency consultants—in particular those who

never examined the claimant—unless the limitations articulated by the treating physician

are not supported by the record."  *Vanprooyen*, 864 F.3d at 572.  The Commissioner

argues that the ALJ followed this rule here by crediting the opinions of Drs. Walsh and

Kwak and including corresponding limitations in Plaintiff's RFC to the extent supported by

the record, but properly rejecting their opinions that Plaintiff "would be significantly limited

in obtaining full-time, competitive employment" as inconsistent with other evidence, based

on limited treatment relationships, and ultimately "reserved to the Commissioner."  (Doc.

17, at 11-13).  Each argument is unavailing.

### 1.     Issues Reserved to the Commissioner

While the ultimate question of disability is reserved to the Commissioner, and a

treating physician's opinion regarding a claimant's ability to work therefore receives no

deference, such an opinion must nevertheless be considered and assessed under the

factors in 20 C.F.R. § 416.927(c).  *Knapp v. Berryhill*, 741 Fed. App'x 324, 327 (7th Cir.

2018) (citing SSR 96-5P, 1996 WL 374183, at *1, 3: "opinions from any medical source

on issues reserved to the Commissioner must never be ignored").  This requires an ALJ

to consider the length and extent of the treatment relationship, the opinion's consistency

with other evidence, and any specialty of the physician.  *Knapp*, 741 Fed. App'x at 327-

28 (citing 20 C.F.R. § 416.927(c)).  Here, the ALJ disregarded the opinions of Drs. Walsh

and Kwak that Plaintiff "would be significantly limited in obtaining full-time, competitive

employment" as inconsistent with "the record as a whole" (R. 22-23), though neither the

ALJ nor the Commissioner identifies any contrary evidence.  Presumably, they refer again

to Plaintiff's part-time job and community college class.  But as explained above, the

accommodations that she requires and receives in both contexts (including the fact that she obtained the job through a family friend, rather than a competitive hiring process) confirm, more than contradict, her difficulty obtaining competitive, full-time employment.

The ALJ's remaining reasons for rejecting these opinions are unpersuasive as well. For instance, he mistakenly asserted that Dr. Kwak (who the ALJ wrongly believed to be a man) had only treated Plaintiff in August and December 2014 (R. 22-23), when in fact, she was Plaintiff's primary care physician for several years. (R. 320-23, 327, 331-32, 400-14, 425-29, 524). And while the ALJ correctly observed that Dr. Walsh evaluated Plaintiff on only one occasion (pursuant to a referral by her pediatric neurologist, Dr. Heydemann), so did both consultative examiners, one of whom spent a total of twenty-eight minutes to review Plaintiff's records and examine her (R. 357-68); yet the ALJ saw no reason to discount their opinions. *See Steele v. Colvin*, No. 14 C 3833, 2015 WL 7180092, at *3 (N.D. Ill. Nov. 16, 2015) (ALJ improperly "singled out Dr. Motycka's report for being a one-time examination, while failing to consider the one-off nature of the other reports in the record, and relying on the state agency consulting physicians' opinions, even though those opinions could be discounted for the very same reasons that the ALJ cited to give little to no weight to Dr. Motycka; namely, that they were based on an even more limited interaction with the Plaintiff."). As importantly, the ALJ failed to address the extensive battery of tests conducted by Dr. Walsh that formed the basis for both her and Dr. Kwak's opinions on a variety of issues that were not reserved to the Commissioner (R. 519-24) and therefore also required analysis under § 416.927(c).

### 2. Opinions of Drs. Walsh and Kwak Based on Dr. Walsh's Testing

As explained above, Dr. Walsh conducted testing to determine Plaintiff's motor functioning (a grip strength test), intellectual ability (the Wechsler Adult Intelligence Scale-

IV or "WAIS-IV"), and language functioning, attention, and other cognitive abilities (the Repeatable Battery for Assessment of Neuropsychological Status or "RBANS"). (R. 518-22). These tests revealed that Plaintiff's grip strength was "extremely low" in both hands and she displayed "significant motor slowness"; her overall scores on the RBANS language and attention indexes were impaired; and her Full Scale IQ of 71 on the WAIS IV fell within the borderline range, with at least one of the four indexes (processing speed) in the severely impaired range at 51. (R. 519, 522).[8] According to Dr. Walsh, a primary reason for Plaintiff's poor performance in these areas was how slowly she worked on the assigned tasks due to her "significant lack of motor control," although there was also evidence of limitations even when motor components were eliminated. (R. 519-22). Based on these results, Dr. Walsh diagnosed Plaintiff with a borderline intellectual disability and other impairments, and opined that her language difficulties precluded a job in customer service, her "severely impaired fine and gross motor speed significantly limit her ability to write and/or type and particularly more so when under time constraints," and her motor limitations would preclude "certain jobs, such as assembly-line work." (R. 523). Dr. Kwak added that Plaintiff would be likewise unsuited to other jobs "with similarly required motor skills." (R. 524). Both physicians also concluded that Plaintiff's intellectual, cognitive, and social limitations and impaired judgement and reasoning limited her ability to work independently, and Dr. Walsh added that Plaintiff would require close supervision and/or an extended training period. (R. 523-24).

Without acknowledging the testing on which these conclusions were based, the ALJ accorded Dr. Walsh's opinions only "some weight" by accepting the portion of her

---

[8] According to the WAIS-IV, a Full-Scale IQ under 70 reflects "intellectual disability." *Williams v. Saul*, No. 18-3559, 2019 WL 4233633, at *1 n.1 (7th Cir. Sept. 6, 2019).

report that Plaintiff "is not capable of customer service, writing, or assembly work," and he accorded Dr. Kwak's opinions "little weight" on the mistaken view that she had treated Plaintiff during only two months over two years earlier, and because her role as a primary care physician was insufficient to support her views. (R. 22-23). This analysis was insufficient. While it is appropriate to give more weight to a specialist's opinion in her area of specialty, it was also necessary to consider the specialized testing by Dr. Walsh on which both she and Dr. Kwak expressly relied. 20 C.F.R. § 416.927(c)(2)(ii), (5) ("We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists"). Indeed, Plaintiff was referred for that evaluation because her pediatric neurologist believed she "would have difficulty functioning as an independent adult but she need[ed] to be properly assessed" to determine the extent of her impairments. (R. 387). Moreover, under the treating physician rule, the ALJ was obliged to assess whether Dr. Kwak's opinions based on that testing (not merely her ultimate conclusion that Plaintiff "would be significantly limited in obtaining full-time, competitive, gainful employment") were supported by medically acceptable findings and consistent with other evidence, and to determine whether those findings were thus entitled to controlling weight. 20 C.F.R. § 416.927(c)(2).

### 3. Opinions Included in RFC

The Commissioner attempts to defend the ALJ's failure to analyze Dr. Walsh's and Kwak's opinions under § 416.927 by arguing that he "largely credited the opinions and included corresponding restrictions in the residual functional capacity finding." (Doc. 17, at 10, 12-13). But the assertion is inaccurate. As discussed further in Part C below, the ALJ's RFC limitations of frequent fine and gross manipulation, an average production pace, and all but "considerable self direction" (R. 18-19) differ substantially from Dr.

Walsh's and Dr. Kwak's findings of fine and gross motor impairments causing Plaintiff to work slowly on manual tasks, particularly under time constraints; the limitations stemming from her autism spectrum disorder and impaired judgment and reasoning on performing independently; and a corresponding need for close supervision and/or an extended training period. (R. 523-24).

Regardless, "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). The ALJ was therefore required to analyze the opinions of Drs. Walsh and Kwak under Section 416.927(c)(2) to determine whether they were entitled to greater or controlling weight, and to "build an accurate and logical bridge between the evidence and the result," not merely declare a "mismatch" between the opinions and "the record as a whole." (R. 22-23). *See also Lambert*, 896 F.3d at 774 (unsupported finding of a "mismatch" between evidence and treating physician's opinion was insufficient). And in so doing, the ALJ was required to address the entirety of the opinions and the test results supporting them, not merely those portions he deemed worthy of inclusion in an RFC that allowed a finding of non-disability. *Gerstner*, 879 F.3d at 262 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." (quoting *Campbell v. Astrue*, 627 F.3d 299-301 (7th Cir. 2010)). Accordingly, the case is remanded for further consideration of the opinions of Drs. Walsh and Kwak and the test results on which they were based and their impact, if any, on Plaintiff's RFC.

### C.     The ALJ's RFC Determination

Plaintiff challenges the ALJ's RFC determination in multiple respects. She argues that the ALJ "repeatedly stopped short of accommodating the deficits endorsed by Plaintiff

and her physicians," and further failed to accommodate her limitations in concentration, persistence, or pace; communication; interacting with others; and immediate memory. As explained below, the Court agrees that the ALJ's RFC assessment failed to address the limitations discussed by Plaintiff's physician's, particularly regarding her cognitive and motor impairments and their effect on her concentration, persistence, and pace. But due largely to Plaintiff's failure to identify any limitations concerning communication, interacting with others, and immediate memory that the ALJ failed to include in Plaintiff's RFC, the Court finds no fault with the ALJ's RFC determination in those respects. *See Davis v. Berryhill*, 723 Fed. App'x 351, 356-57 (7th Cir. 2018) (claimant waived challenge that ALJ erred by not including limitations regarding one of her impairments in her RFC "by not developing it in her brief" and failing to explain "what limitations should have been included").

### 1. Limitations Concerning Communication, Interacting with Others, and Immediate Memory

The ALJ properly acknowledged and considered multiple records documenting Plaintiff's speech impairment and its negative impact upon her interactions with others, particularly over the phone. (R. 18-22).[9] But the ALJ and several other sources (including one of Plaintiff's medical providers and her consulting examiner, Dr. Walsh) also observed that her speech, while difficult to understand, is "generally intelligible." (R. 22 (ALJ: "spoke with somewhat of a speech impairment but was understandable); R. 325

---

[9] *See also* R. 363: "speech was impaired and she had difficulty to get the words out," but "comprehension was entirely normal"; R. 366 "At times, the claimant's speech can be difficult to understand"; R. 367: "Speech quality was slow. Speech pronunciation was over-articulated. Concerning organization of language, the claimant showed difficulties in finding words"; R. 387: "Speech is hard to understand due to slow prosody and abnormal breath pattern between words, pronunciation is difficult"; R. 518: "Her speech was severely dysarthric"; R. 525: "Ct shared her frustration at having difficulty expressing herself over the phone due to her speech disability."

(treatment note: "Normal for patient per mom, speech is slow, but pt. is able to communicate effectively"); R. 519 (Dr. Walsh: "Conversational speech was dysarthric but generally intelligible")).  Thus, the ALJ endeavored to address Plaintiff's limited abilities in this area by excluding work "which requires complex or frequent written or verbal communication" and all "telephone communication."  (R. 19).  Plaintiff has failed to explain why this limitation is insufficient or a more restrictive limitation is required.

The same is true for the RFC limitation regarding Plaintiff's interactions with others. Again, while the record demonstrates Plaintiff's limitations interacting with others due to her communication difficulties, autism spectrum disorder, and intellectual limitations (R. 18, 388, 520, 523-24), it also shows that Plaintiff is nevertheless able to interact with others to at least a limited extent.[10]  Here again, the ALJ endeavored to restrict Plaintiff to a level of interaction that the record demonstrates she can tolerate by precluding "work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public which is incidental to her primary job duties."  (*Id.*).  And again, Plaintiff has failed to explain why this limitation is insufficient or a more restrictive limitation was required (Doc. 12, at 11), and indeed, abandoned the argument altogether in her Reply.  (Doc.  18).

Plaintiff's argument concerning her immediate memory deficit is equally unhelpful. Her brief complains that "the ALJ noted problems with immediate memory, but seemed

---

[10]    *See*, *e.g.*, R. 363: "Appearance, behavior and ability to relate during the examination were normal.  The claimant was appropriate, polite, pleasant, and cooperative."; R. 366-67: "she was polite and cooperative. . . . Mood was pleasant and stable. Affect was appropriate and consistent with the content of the conversation."; R. 518: "Interpersonally, the patient was friendly but quiet in demeanor. She displayed good eye contact throughout the evaluation."; R. 520: "The patient does not demonstrate inappropriate or aggressive behavior, however.  She demonstrates good eye contact and grossly intact social skills with occasional withdrawn behavior."

to believe those were irrelevant because she can understand and follow directions" with "no indication of how one positive seems to outweigh one, quite different negative." (Doc. 12, at 11). The Court agrees with the Commissioner that the ALJ did not deem Plaintiff's immediate memory limitations irrelevant, but rather considered them along with her reported ability to understand and follow directions without needing repeating or redirection (R. 518) and reasonably concluded that she had a moderate limitation in understanding, remembering, or applying information. (R. 17-18). Plaintiff challenged none of those findings here or below. (R. 255-57). Nor does she identify any limitation relating to her immediate memory that should have been included in her RFC.

## 2. Limitations Identified by Plaintiff's Physicians, Including Regarding Concentration, Persistence, and Pace

Plaintiff's challenge concerning her limitations in concentration, persistence, and pace is more persuasive. She argues that the ALJ noted record evidence indicating Plaintiff's trouble maintaining focus and found that she has moderate limitations in concentration, persistence, or maintaining pace (R. 18) but failed to accommodate those limitations in her RFC. (Doc. 12, at 11-12). The Court agrees that the ALJ's decision fails to explain how these limitations were accommodated. As discussed above, the record reflects Plaintiff's difficulties maintaining a normal pace at work (R. 38-39, 48), in school (R. 42, 54, 384), and in the evaluations and testing she underwent. (R. 388, 519, 522). Her pediatric neurologist Dr. Heydemann explained that Plaintiff "learns slowly but is capable when the work load is light" (R. 388); and her examining consultant Dr. Walsh explained that a predominant reason for her poor performance in the IQ and other cognitive testing Plaintiff underwent was her that significant lack of motor control caused her to work slowly on timed activities, along with "visuo-perceptual limitations when the

29

motor component was eliminated." (R. 519, 522). Yet, without citing any supporting evidence, the ALJ found Plaintiff capable of "work at an average production pace," though "not at a significantly above average or highly variable pace." (R. 19).

The Commissioner makes two arguments in defense of the ALJ's determination that Plaintiff's moderate limitations in concentration, persistence, and pace did not preclude an average-paced, full-time workload. The first argues (once again) that "the ALJ "reasonably considered that plaintiff could sustain part-time work, and concentrate sufficiently to complete college coursework." (Doc. 17, at 9). But while the ALJ relied upon Plaintiff's part-time job and online class to conclude that her limitations in concentration, persistence, or pace were only moderate (as opposed to marked), and to conclude that Plaintiff is able "to perform less demanding work at SGA levels" (R. 18, 22), the decision offers no explanation for how Plaintiff would handle such work at an average production pace, when the record repeatedly reflects that she required accommodations at work and in school to compensate for her subpar pace. (R. 38-39, 42, 48, 54, 384, 388, 519, 522). In short, both the Commissioner and the ALJ have failed to explain how Plaintiff's inability to maintain an average pace at a part-time job 12 hours a week and during a single online course indicate an ability to handle an average production pace during a full-time work week.

The Commissioner next argues that the ALJ "included limitations in the residual functional capacity finding addressing plaintiff's cognitive limitations" and thus "accommodated plaintiff's moderate limitations with significant restrictions in the residual functional capacity finding, based on medical opinions." (Doc. 17, at 9-10, citing R. 19). But neither the Commissioner nor the ALJ have explained what these "significant restrictions" are. Presumably, the Commissioner refers to the limitations restricting

Plaintiff to "simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment," with no "multitasking or considerable self-direction." (R. 19). But the Commissioner and the ALJ fail to explain how Plaintiff could perform such simple tasks full-time at an average production pace. As the Seventh Circuit has repeatedly explained, "observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including for example, over the course of a standard eight-hour work shift." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citing *O'Connor Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.")). And the added limitations precluding "a significantly above average or highly variable pace" and "tandem tasks" where one team member's task is dependent upon another's (R. 19, 64) similarly fail to address the pace that Plaintiff herself is able to handle. *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir. 2019) ("there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace"); *Paul v. Berryhill*, 760 Fed. App'x 460, 465 (7th Cir. 2019) (excluding "production rate pace" and "tandem tasks" still failed to address "moderate limitations with following a schedule and sticking to a given task" or specify the pace at which claimant could work).

A related complication is the ALJ's failure to address other limitations found by Plaintiff's treating and consulting physicians (Drs. Heydemann, Kwak, and Walsh) concerning her lack of coordination, low grip strength, lack of motor control, motor slowness, and impaired fine and gross motor speed (R. 388, 519, 522, 523-24), which

Dr. Walsh explained partially account for her difficulty completing manual tasks, especially under time constraints. (R. 522). While the ALJ noted the treatment records indicating these issues (R. 20-22) he apparently accepted the medical consultative examiner's report that her "physical examinations were without any abnormalities" and relaxed Plaintiff's RFC to allow "fine and gross manipulation frequently." (R. 18-19, 21, citing R. 357-63). At a minimum, the ALJ was obliged to resolve the conflict. *See Walters v. Astrue*, 444 Fed. App'x 913, 918 (7th Cir. 2011) ("The ALJ should have addressed the apparent conflict that exits among these different pieces of evidence.").[11]

Wholly apart from Plaintiff's motor difficulties, the ALJ further failed to address other evidence in the record that called into question her ability to maintain an average production pace without any learning or training accommodations, such as Dr. Walsh's opinion that a person having Plaintiff's intellectual and autism impairments would require close supervision and/or an extended training period (R. 524) and the opinion of Plaintiff's pediatric neurologist, Dr. Heydemann, that she "learns slowly." (R. 388). While the ALJ might have deemed these accommodations unnecessary for the simple, routine tasks included in Plaintiff's RFC, he was obliged to provide an explanation as to why. *See Lanigan*, 865 F.3d at 565-66 (explaining that "simple, routine, and repetitive tasks" refer to "unskilled work," which the regulations "define as work that can be learned by demonstration in less than 30 days," but "the speed at which work can be learned is

---

[11]     As the Commissioner acknowledges, the ALJ's hypothetical to the VE was more limited than the RFC finding in the ALJ's decision in that the hypothetical restricted Plaintiff to merely occasional fine manipulation. (Doc. 17, at 14 n.7; R. 62-63). The Commissioner argues this discrepancy is harmless, however, because the two jobs identified by the VE nevertheless called for only occasional fingering. (R. 64). But even so, the record fails to reveal whether the VE's decision nevertheless would have been affected by reduced gross manipulation, low grip strength, lack of motor control, motor slowness, and/or impaired gross motor speed.

unrelated to whether a person with mental impairments—i.e., difficulties maintaining concentration, persistence, or pace—can perform such work").

Accordingly, the case is remanded for reconsideration of Plaintiff's RFC in light of the foregoing evidence. The ALJ is also directed to apprise any VE whose testimony is relied upon of any additional limitations in Plaintiff's RFC that are determined on remand, including any limitations in concentration, persistence, and pace. "When the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments, this error necessarily calls into doubt the VE's ensuing assessment of available jobs." *Crump*, 932 F.3d at 570 ("the ALJ must ensure that the VE is 'apprised fully of the claimant's imitations' so that the VE can exclude those jobs that the claimant would be unable to perform.") (quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)). The ALJ provided the VE such a deficient basis here by allowing simple, routine tasks, simple decision-making, and simple judgment, and occasional, minor changes (R. 63) without identifying Plaintiff's limitations in concentration, persistence, or pace. *Id.*; *Moreno*, 882 F.3d at 730 (hypothetical to VE limited to such tasks improperly failed to address concentration, persistence, or pace).

### D. The ALJ's Step Five Determination

Plaintiff next argues that the ALJ erroneously accepted the VE's testimony regarding the number and types of jobs available in the national economy that she is allegedly able to perform. Plaintiff makes three arguments in this regard, but none demonstrates any error by the ALJ.

### 1. Reliance on the DOT

Plaintiff first contends that the VE (and in turn, the ALJ) wrongly relied upon the Dictionary of Occupational Titles ("DOT") for the number of available jobs, when (according to Plaintiff) it is both outdated and lacking information on which to base such

an estimate. (Doc. 12, at 14-15; Doc. 18, at 4-5). But while the Seventh Circuit has repeatedly noted that the DOT is outdated and the Social Security Administration has been working on a more current resource, the Court of Appeals has found no error in relying on VE testimony that cited job descriptions from the DOT. To the contrary, Plaintiff's own authority (*Chavez v. Berryhill*) and multiple district court decisions have repeatedly noted that the Social Security Administration's regulations "authorize the agency to 'take administrative notice of reliable job information' from the DOT, among other publications." *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018) (quoting 20 C.F.R. § 416.966(d)(1)).[12]

As a result of these regulations (and as the Seventh Circuit further observed in *Chavez*), "the DOT is a source that VEs regularly canvass to identify job titles suitable for a claimant." *Chavez*, 895 F.3d at 965. And while the Seventh Circuit continues to express concern over the DOT's obsolescence (*e.g.*, *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018)), the Court of Appeals has not prohibited its use. *Chavez*, 895 F.3d at 965-67 ("we have not prohibited its use or deemed its application reversible error"). In any event, any challenge to the VE's testimony based on jobs numbers required objection during the hearing. *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (claimant "forfeited her argument regarding the vocational expert's testimony about the number of positions for each of the six jobs by failing to object during the hearing"). As the Commissioner correctly asserts, Plaintiff's counsel voiced no such objection during the hearing here. (Doc. 17, at 14; R. 50, 64-65).

---

[12]     *See also Slone v. Berryhill*, No. 17-cv-00452, 2018 WL 5729591, at *6 (N.D. Ind. Nov. 1, 2018) (same, citing 20 C.F.R. 404.1566); *Horner v. Berryhill*, No. 17 C 4823, 2018 WL 1394038, at *2 n.1 (N.D. Ill. Mar. 20, 2018) (same); *Fitzgerald v. Colvin*, 15-cv-135, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016) (same, citing 20 C.F.R. §§ 404.1566 and 416.966).

## 2. Failure to Provide Regional Jobs Numbers

Plaintiff's second challenge to the VE's testimony complains that the ALJ failed to present regional jobs numbers, citing *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). (Doc. 12, at 14-15). But *Browning* and other Seventh Circuit decisions have repeatedly stated that national data, such as the VE provided here (R. 64) is sufficient.[13] And to the extent any of these decisions contemplates reliance upon regional data, the Seventh Circuit has further explained that the purpose of such localized figures is to prevent a denial of benefits "on the basis of 'isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where the applicant lives'" (*Barrett v. Barnhart*, 368 F.3d 691, 692 (7th Cir. 2004) (per curiam) (brackets omitted)), as opposed to jobs available "across the nation." *Chavez*, 895 F.3d at 968. In addition to her failure to object to the VE's citation of national figures during the administrative hearing, Plaintiff also makes no argument to this Court that the jobs the VE identified – cleaner and sorter – "exist only in very limited numbers in relatively few locations outside the region where the applicant lives." This omission is similarly fatal to her challenge.[14]

---

[13]    *See Chavez*, 895 F.3d at 968 ("the agency is required to focus on what jobs a particular individual can perform . . . and then to estimate the number of those jobs that exist across the nation (or, at a minimum, in a region)"); *Herrmann v. Colvin*. 772 F.3d 1110, 1114 (7th Cir. 2014) ("if there is a substantial number of such jobs in the nation, the applicant's claim fails, no matter how few there are in his locality or region"); *Browning*, 766 F.3d at 708 ("The reason the vocational expert is required to estimate the number of jobs the claimant can do that exist in the local, regional, and national economy is that, as the regulation indicates, if there is a large number of such jobs in any of the three areas ('region' presumably encompassing both a local area and the entire state), the claimant loses.").

[14]    *See, e.g., James A. B. v. Comm'r of Soc. Sec.*, No. 18-cv-0814, 2019 WL 176174, at *6 (S.D. Ill. Jan 11, 2019) ("Plaintiff does not argue the jobs identified by the VE exist only in isolation or in concentrated regions."); *John D. C. v. Comm'r of Soc. Sec.*, No. 17-cv-1116, 2018 WL 6018859, at *5 (S.D. Ill. Nov. 16, 2018) (same: "Any such argument would be frivolous. The jobs identified by the VE (cleaner, kitchen helper, and laundry worker) are not regional."); *Sugg v. Berryhill*, No. 17-cv-375, 2018 WL 1517766, at *7 (S.D. Ill. Mar. 28, 2018) (same: "The VE identified jobs like a housekeeper and a routing clerk, which are not regional.").

### 3. Sorter and Cleaner Positions

Finally, Plaintiff disputes the feasibility of an individual with the motor speed impairments, problems using her hands, and mental deficits that Plaintiff claims sustaining work as a sorter or cleaner forty hours a week. (Doc. 12, at 15). The Court has already noted the need on remand to reconsider the limitations in Plaintiff's RFC addressing her mental impairments, and to resolve the evidentiary conflict regarding her grip and motor impairments and determine whether her RFC requires adjustment in those respects as well. (*See supra* Part C). The Court otherwise expresses no view regarding the appropriateness of any particular job for Plaintiff once those determinations are made. That, with the benefit of properly informed vocational expert testimony, is for the ALJ to decide on remand.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Ciara H's Motion for Summary Judgment requesting reversal or remand (Doc. 11) is granted, and the Commissioner's Motion for Summary Judgment asking that the decision be affirmed (Doc. 16) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated: September 20, 2019

_____
SHEILA FINNEGAN
United States Magistrate Judge